**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAKE BRUANER, on behalf of himself and all others similarly situated, | Case No. CV 14-8869 FMO (AGRx) |
| Plaintiff, | |
| v. | **ORDER RE: MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT** |
| MUSCLEPHARM CORPORATION, et al. | |
| Defendants. | |

Having reviewed the briefing filed with respect to defendant's Motion to Dismiss Plaintiff's Second Amended Complaint ("Motion"), the court concludes that oral argument is not necessary to resolve the Motion.  See Fed. R. Civ. P. 78; Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001).

**INTRODUCTION**

Jake Bruaner ("Bruaner" or "plaintiff") filed this action, individually and on behalf of others similarly situated, against MusclePharm Corporation ("MPC" or "defendant") on November 14, 2014.  (See Complaint).  In response to defendant's motion to dismiss, plaintiff filed a Second Amended Complaint ("SAC") on June 17, 2015.  (See SAC).  Plaintiff alleges that defendant "knowingly and willfully misrepresent[s] the contents of" MusclePharm Combat Protein Powder ("the Product" or "Combat Powder") to consumers and asserts causes of action for (1) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq.; (2) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq.;

(3) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; (4) unjust enrichment; and (5) breach of express warranty.  (See FAC at ¶¶ 1 & 63-116).  Plaintiff seeks declaratory and injunctive relief, restitution and disgorgement, compensatory damages, exemplary damages, and "other further relief as the nature of the case may require[.]"  (See id. at 22-23, Relief Requested).

On June 24, 2015, defendant filed the instant Motion, asserting that the Food and Drug Administration ("FDA") has primary jurisdiction over dietary supplements; that plaintiff's claims are preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA") and the FDA's regulations; that plaintiff lacks standing to assert claims based upon MPC's website; that plaintiff fails to plead fraud with particularity; and that plaintiff fails to state a claim for unjust enrichment.  (See Motion at 1-2 & 15).

## FACTUAL ALLEGATIONS

Plaintiff purchased Combat Powder in 2014 from a Costco store in Marina Del Rey, California.  (See SAC at ¶ 22).  He alleges that "[t]he FDA method for determining a product's protein content is measured by the total nitrogen content found in a serving of a food or dietary supplement."  (Id. at ¶ 3).  The FDA uses this method because "protein [is] the only macronutrient that provides nitrogen, which comes from protein's chains of amino acids[,]" and as a result, "the FDA allows the total nitrogen content to be attributed to protein."  (Id.) (emphasis in original).  According to plaintiff, however, "[i]t is important to note that many other non-macronutrient ingredients do indeed contain nitrogen[,]" and thus, "not all ingredients that contain nitrogen are protein."  (Id. at ¶ 4).  Plaintiff alleges that MPC has "stuff[ed] [its] product with these other non-protein, nitrogen-containing ingredients in order to artificially boost [its] stated protein content[.]"  (Id. at ¶ 5).

Although stating protein content this way is "technically correct when place[d] in the nutritional content box per the FDA guidelines," plaintiff alleges that statements are misleading and false because MPC "holds itself out to calculating protein content without including the nitrogen attributed to non-protein nitrogen sources."  (SAC at ¶¶ 5-6).  For example, MPC states in its "Brand Promise" that it does not "'include amino acids, creatine[,] and other non-protein, nitrogen

sources in [its] protein content.'" (Id. at ¶ 6) (emphasis omitted). Plaintiff alleges that such statements "permeate[] Defendant's marketing strategy through all marketing channels[.]" (Id. at ¶ 7; see also id. at ¶ 37) (alleging that defendant misleads the public "by the way it labels its product, the advertisements it makes, and by producing test results from tests that include non-protein, nitrogen sources which are directly contrary to the 'Brand Promise'"). In addition, plaintiff alleges that MPC lists ingredients on the Combat Powder product label "that the Product does not contain, and [] fail[s] to claim ingredients that the Product does contain." (Id. at ¶ 19).

Plaintiff alleges that he and the putative class members reasonably relied on MPC's representations regarding protein content (see SAC at ¶¶ 22-23), and that "[a]s a result of [MPC's] deceptive, fraudulent, unfair and misleading practices, Plaintiff and the Class Members have been unfairly deceived into purchasing the Product which they would not otherwise have purchased, or would have purchased only at a lower price than that charged by [MPC]." (Id. at ¶ 24).

**LEGAL STANDARD**

I.   MOTIONS TO DISMISS.

A motion to dismiss for failure to state a claim should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly (Twombly), 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007); see Ashcroft v. Iqbal (Iqbal), 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009); Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; see Cook, 637 F.3d at 1004; Caviness v. Horizon Cmty. Learning Ctr., Inc., 590 F.3d 806, 812 (9th Cir. 2010). The plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S.Ct. at 1965; Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; see also Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 973 (9th Cir. 2004), cert. denied, 544 U.S. 974 (2005) ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or

unreasonable inferences.") (citations and internal quotation marks omitted).  "Specific facts are not necessary; the [complaint] need only give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests."  Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200 (2007) (per curiam) (citations and internal quotation marks omitted); see Twombly, 550 U.S. at 555, 127 S.Ct. at 1964.

In considering whether to dismiss a complaint, the court must accept the allegations of the complaint as true, Erickson, 551 U.S. at 93-94, 127 S.Ct. at 2200; Albright v. Oliver, 510 U.S. 266, 268, 114 S.Ct. 807, 810 (1994), construe the pleading in the light most favorable to the pleading party, and resolve all doubts in the pleader's favor.  See Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1849 (1969); Berg v. Popham, 412 F.3d 1122, 1125 (9th Cir. 2005).  Dismissal for failure to state a claim can be warranted based on either a lack of a cognizable legal theory or the absence of factual support for a cognizable legal theory.  See Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).  A complaint may be dismissed also for failure to state a claim if it discloses some fact or complete defense that will necessarily defeat the claim.  See Franklin v. Murphy, 745 F.2d 1221, 1228-29 (9th Cir. 1984).

II.   PRIMARY JURISDICTION.

Even if plaintiff's claims are sufficiently pled such that they would typically survive a motion to dismiss, the court may stay the proceedings or dismiss the complaint if the matters raised in the case are within the primary jurisdiction of the FDA.  "Primary jurisdiction is a prudential doctrine that permits courts to determine 'that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch.'" Astiana v. Hain Celestial Group, Inc., 783 F.3d 753, 760 (9th Cir. 2015) (quoting Clark v. Time Warner Cable, 523 F.3d 1110, 1114 (9th Cir. 2008)).  The doctrine applies when there is "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." Syntek Semiconductor Co., Ltd. v. Microchip Technology, Inc., 307 F.3d 775, 780 (9th Cir. 2002).

1   "Not every case that implicates the expertise of federal agencies warrants invocation of

2   primary jurisdiction.   Rather, the doctrine is reserved for a limited set of circumstances that

3   requires resolution of an issue of first impression, or of a particularly complicated issue that

4   Congress has committed to a regulatory agency." Astiana v. Hain Celestial, 783 F.3d at 760

5   (internal quotation marks omitted).  The Ninth Circuit has stated that "even when agency expertise

6   would be helpful, a court should not invoke primary jurisdiction when the agency is aware of but

7   has expressed no interest in the subject matter of the litigation[,]" or when "referral to the agency

8   would significantly postpone a ruling that a court is otherwise competent to make." Id. at 761.

9   Courts should also take into account "whether invoking primary jurisdiction would needlessly delay

10  the resolution of claims." Id. at 760.

11      If a court determines that the doctrine of primary jurisdiction applies, it must either stay the

12  case pending an administrative ruling or dismiss the case without prejudice. See Astiana v. Hain

13  Celestial, 783 F.3d at 761.  "When the purpose of primary jurisdiction is for parties to pursue their

14  administrative remedies, a district court will normally dismiss the case without prejudice. However,

15  when a court invokes primary jurisdiction but further judicial proceedings are contemplated, then

16  jurisdiction should be retained by a stay of proceedings, not relinquished by a dismissal." Id.

17  (internal quotation marks and citation omitted).  "In either circumstance, the district court must be

18  attuned to the potential prejudice arising from the dismissal of claims." Id.

19                                    **DISCUSSION**

20      As stated above, MPC asserts that plaintiff's claims should be dismissed for the following

21  reasons: the FDA has primary jurisdiction over dietary supplements; plaintiff's claims are

22  preempted by the FDCA and the FDA's regulations; plaintiff lacks standing to assert claims based

23  upon MPC's website; plaintiff fails to plead fraud with particularity; and plaintiff fails to state a claim

24  for unjust enrichment.  (See Motion at 1-2 & 15).

25      Before addressing each of the arguments, the court sets out the two groups of factual

26  allegations that form the basis of plaintiff's causes of action, as the discussion with respect to each

27  of defendant's arguments is organized accordingly.  Plaintiff alleges that Combat Powder violates

28  FDA regulations by: (1) "misrepresent[ing] to the consumer that the protein content listed on its

Packaging and FDA Label does not include non-protein nitrogen sources" (Plaintiff's Opposition to Defendant's Motion to Dismiss Second Amended Complaint ("Opp.") at 6) (citing SAC at ¶¶ 5-16, 19-20, 25, 31-32, 34-35, 37-38, 41, 70, 74-75); and (2) using "intentionally false and misleading" misrepresentations in its advertising, including the "Brand Promise," because MPC does include non-protein nitrogen sources when calculating its protein content. (Opp. at 6) (citing SAC at ¶¶ 5-16, 19-20, 25, 31-32, 34-35, 37-38, 41, 70, 74-75).   These two types of allegations, although somewhat distinct in that they are based on (1) packaging and labeling; and (2) advertising, are grouped together because they are based upon one underlying allegation, i.e., that the Product's protein count includes non-protein nitrogen-containing ingredients.   Third, plaintiff alleges that Combat Powder violates FDA regulations by "listing ingredients on the FDA label that they do not place in the product." (Opp. at 6-7) (citing SAC at ¶¶ 17-19, 22, 43-44, 70, 74-75).   The court addresses each of defendant's arguments, as applied to each of the two groups of factual allegations, below.

I.    WHETHER THE FDA HAS PRIMARY JURISDICTION.

Defendant claims that at the hearing on its Motion to Dismiss Plaintiff's First Amended Complaint, plaintiff's counsel conceded that all claims regarding the label itself (i.e., if plaintiff claims that "what they're saying on the label is misleading"), "should be covered by primary jurisdiction." (See Motion at 8).   In its Motion, defendant quotes every instance that plaintiff used the word "label" in its SAC and states that, "[g]iven plaintiff's concession that claims based on label content . . . fall within FDA's primary jurisdiction," plaintiff's claims should be dismissed on that basis. (See id. at 9-10).   Defendant further asserts in its Reply Memorandum in Support of Motion of Defendant MusclePharm Corporation to Dismiss Plaintiff's Second Amended Complaint ("Reply") that plaintiff is asking the court to "usurp FDA's authority" because his claims are "premised on the results of a test that does not conform to FDA's approved method" and he is "asking the Court to impose a different standard on MusclePharm tha[n] that required by FDA." (Reply at 5).

Plaintiff responds that he is simply asserting false advertising claims on the basis that MPC is "making a promise about the content of the product that is untrue." (Opp. at 13).   In other

words, the claims involve MPC's "intentional deception of the consumer by promising one thing and delivering much less, and by not listing correct ingredients on the FDA Label." (Id. at 14). "Plaintiff is not claiming that the FDA's testing procedure is improper, and that the FDA should adopt Plaintiff's testing so that protein content would be more properly labeled[.]" (Id.). Plaintiff concedes that if he were making such claims, they "might very well be ripe for primary jurisdiction[.]" (Id.).

The court is not persuaded by defendant's argument that the FDA has primary jurisdiction over this case. Plaintiff is not asking the court to impose standards that the FDA does not impose, nor do his claims require MPC to label protein content according to "tests using non-FDA approved methods." (See Reply at 5). On the contrary, plaintiff's claims are premised on his assertion that defendant "is making a promise about the content of the product that is untrue." (Opp. at 13; see, e.g., SAC at ¶¶ 75) (claiming that defendant has "advertise[ed] that the protein content on their labels do not count nitrogen content from 'non-protein' sources, [and] produc[ed] test results that [were] intended to mislead the public into believing that Defendant does not include non-protein, nitrogen sources in its protein content") . As plaintiff points out, "[d]etermining whether labeling and advertising are false or deceptive under consumer protection laws is not an issue outside 'the conventional experience of judges.'" (Opp. at 13) (quoting U.S. v. Western Pac. R.R. Co., 352 U.S. 59, 64, 177 S.Ct. 161,  165 (1956)).  Indeed, courts frequently confront food labeling and advertising cases such as this one, and they routinely retain jurisdiction over them.  See, e.g., Jones v. ConAgra Foods, Inc., 912 F.Supp.2d 889, 898-99 (N.D. Cal. 2012) (concluding that the case, based on claims under the UCL, FAL, and CLRA,  was "far less about science than it [was] about whether a label [was] misleading[,]" and noting that "every day courts decide whether conduct is misleading") (internal quotation marks omitted); Delacruz v. Cytosport, Inc., 2012 WL 2563857, *10 (N.D. Cal. 2012) (analyzing CLRA, UCL, and FAL claims and finding that the "FDA's expertise . . . is not necessary to determine whether the labels are misleading.  The reasonable-consumer determination and other issues involved in Plaintiff's lawsuit are within the expertise of the court's to resolve."); Chacanaca v. Quaker Oats Co., 752 F.Supp.2d 1111, 1124 (N.D. Cal. 2010) ("whether or not the [aspects of the packaging and label] are misleading [does] not entail

1    technical questions or require agency expertise").

2          Defendant's argument that the FDA's adoption of standard testing methods for determining

3    protein content "signals an FDA conclusion" that it has all authority over such questions, (see

4    Reply at 5), misses the point; plaintiff does not ask this court to opine on the technicalities of

5    testing protein content in food or supplements.  On the contrary, plaintiff claims that

6                [e]ither Defendant did or did not use "non-protein nitrogen ingredients" in

7                computing its protein content.  If it did, then its Brand Promise was a sham,

8                its Packaging and FDA Labeling was defective, the Advertising would be

9                false, and it violated an express warranty.  Additionally whether or not

10               Defendant listed all ingredients on the FDA Label is purely a factual question.

11               Discovery on their orders and product formula will reveal whether they did or

12               if they did not.

13   (Opp. at 15; see also, id. at 14) ("Plaintiff's claims . . . involve Defendant's intentional deception

14   of the consumer by promising one thing and delivering much less").[1]  "As courts faced with state-

15   law challenges in the food labeling arena have reasoned, [these are] question[s] courts are well-

16   equipped to handle."  Chacanaca, 752 F.Supp.2d at 1124 (internal quotation marks omitted).

17   Accordingly, application of the primary jurisdiction doctrine is not warranted.

18   II.   WHETHER PLAINTIFF'S CLAIMS ARE PREEMPTED.

19         "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts

20   state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative

21   field to such an extent that it is reasonable to conclude that Congress left no room for state

22   regulation in that field."  Chae v. SLM Corp., 593 F.3d 936, 941 (9th Cir.), cert. denied, 562 U.S.

23   961 (2010) (internal quotation marks omitted).  When analyzing the scope of a preemption statute,

24

_____

25         [1] Plaintiff is similarly clear in his SAC, stating that MPC's listed protein content is "technically
26   in line with FDA guidelines.  However, that is not the issue in this case nor is it the issue that
     Plaintiff is attempting to raise in any manner whatsoever.  Rather, the issue is that Defendant
27   makes claims that go well beyond FDA regulations and claim that their products do not count non-
     protein, nitrogen sources towards their protein content. This is a claim that the FDA . . . does not
28   regulate."  (SAC at ¶ 31) (emphasis omitted).

a court's analysis must "start with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 2250 (1996) (internal quotation marks omitted). Such an approach "is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." Id. Accordingly, "[p]arties seeking to invalidate a state law based on preemption bear the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." Stengel v. Medtronic Inc., 704 F.3d 1224, 1227 (9th Cir. 2013) (en banc), cert. denied, 134 S.Ct. 2839 (2014) (internal quotation marks omitted).

Defendant asserts that "the labeling of protein content is specifically addressed in FDA's regulations and falls squarely within the statutes and regulations covered by the [Nutritional Labeling and Education Act's ('NLEA')] express preemption provision." (Motion at 10). However, for the reasons discussed below, the court is not persuaded that defendant has overcome the "considerable burden" that "Congress d[id] not intend to supplant state law" with respect to all of plaintiff's claims. See Stengel, 704 F.3d at 1227.

A.     The Statutory and Regulatory Framework.

The FDCA "gives the FDA the responsibility to protect the public health by ensuring that 'foods are safe, wholesome, sanitary, and properly labeled.'" Lockwood v. Conagra Foods, Inc., 597 F.Supp.2d 1028, 1030 (N.D. Cal. 2009) (quoting 21 U.S.C. § 393(b)(2)(A)). "Section 331 expressly prohibits the misbranding of food in interstate commerce, while Section 343 sets forth conditions under which food is considered 'misbranded[.]" Bruton v. Gerber Products Co., 961 F.Supp.2d 1062, 1079 (N.D. Cal. 2013) (internal quotation marks and citations omitted). "In general, food is 'misbranded' if its labeling is 'false or misleading in any particular.'" Id. (quoting 21 U.S.C. § 343(a)(1)). The NLEA, enacted in 1990, amended the FDCA and aimed to "clarify and . . . strengthen the [FDA's] legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about nutrients in foods." H.R. Rep. No. 101-538, (1990), reprinted in 1990 U.S.C.C.A.N. 3336, 3337. In addition, part of its "purpose was to 'create uniform national standards regarding the labeling of food.'" Bruton, 961 F.Supp.2d at 1079

9

(quoting In re Farm Raised Salmon Cases, 42 Cal.4th 1077, 1086 (2008)).

The FDCA and NLEA expressly preempt any state or local "requirement for nutrition labeling of food that is not identical" to certain FDA requirements, including 21 U.S.C. § 343(q) ("§ 343(q)") and 21 U.S.C. § 343(r) ("§ 343(r)").  See 21 U.S.C. §§ 343-1(a)(4) & (5).  First, § 343(q) provides for the preemption of "nutrition information" statutes and regulations, which discuss the "information that must be disclosed about certain nutrients in food products."  See Chacanaca, 752 F.Supp.2d at 1116 (italics omitted).  The statutes and regulations covered include those that describe, for example, "the nutrition box area that a food manufacturer must inform consumers of . . . the total number of calories per serving or the quantities of various nutrients contained in a food product."  See id.

Section 343(r) provides for the preemption of statutes and regulations related to "nutrition levels and health-related claims about a food product[.]" Chacanaca, 752 F.Supp.2d at 1117 (internal quotation marks omitted).  In other words, it governs "all voluntary statements about nutrient content or health information a manufacturer chooses to include on a food label or packaging . . . [such as] claims that expressly or by implication[] characterize the level of any nutrient, or characterize the relationship of any nutrient to a disease or health[-]related condition." See id. (internal quotation marks and emphasis omitted).

As stated above, these provisions preempt any "requirement" that is not identical to the FDA requirements regarding nutrient content (§ 343(q)) and nutrition levels and health-related claims (§ 343(r)).  The term "requirement" is interpreted to "reach[] beyond positive enactments like statutes and regulations, to embrace common-law duties and judge-made rules."  See Chacanaca, 752 F.Supp.2d at 1118.  However, "[w]here a requirement imposed by state law effectively parallels or mirrors the relevant sections of the NLEA, courts have repeatedly refused to find preemption." Id., citing N.Y. State Rest. Assn. v. N.Y. City Bd. of Health, 556 F.3d 114, 123 (2d Cir. 2009); Chavez v. Blue Sky Natural Beverage Co., 268 F.R.D. 365, 370 (N.D. Cal. 2010); see also Salazar v. Honest Tea, Inc., 2014 WL 2593601, *4 (E.D. Cal. 2014) ("The NLEA is clear, however, that if state law seeks to impose liability consistent with the FDCA, the law is not preempted.").  The FDA approves of such an approach, as it has issued a Final Rule stating that

10

"if the State requirement does the same thing as Federal law does . . . then it is effectively the same requirement as the Federal Requirement. . . . [T]he only State requirements that are subject to preemption are those that are affirmatively different from the Federal requirements on matters that are covered by [NLEA]."  60 Fed. Reg. 57076, 57120 (Nov. 13, 1995).

Through the so-called "Sherman Law," California has formally adopted the federal labeling requirements as its own.  See Cal. Health & Safety Code § 110100(a) ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state.").  The state "has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations."  Bruton, 961 F.Supp.2d at 1080 (citing Cal. Health & Safety Code § 110670, which provides that "[a]ny food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims as set forth in [the FDCA]").

B.    Application of the Statutory and Regulatory Framework to Plaintiff's Claims.

The question here is whether plaintiff's action involves claims or labeling described in NLEA's express preemption provisions: § 343(q) regarding nutrient content, or § 343(r) regarding health claims and levels of nutrients.  See §§ 343-1(a)(4) & (5).  If not, the preemption provisions do not apply, and the court need not evaluate whether plaintiff seeks to impose upon MPC requirements that are different than those set forth in federal law.  See, e.g., Chacanaca, 752 F.Supp.2d at 1119 ("plaintiffs' claims need not fail on preemption grounds if the requirements they seek to impose are either identical to those imposed by the FDCA and the NLEA amendments or do not involve claims or labeling information of the sort described in [the NLEA express preemption provisions]"); see also Ackerman v. Coca-Cola Co., 2010 WL 2925955, *6 (E.D.N.Y. 2010) (same).

1.    **Allegedly Misleading Statements on Combat Powder's Packaging and Label and in Combat Powder Advertising**.

Defendant argues that plaintiff's claims regarding the alleged misleading statements are preempted because "the labeling of protein content . . . falls squarely within the statutes and

regulations covered by the NLEA express preemption provision." (Motion at 10). Defendant is correct in one sense: the amount of protein listed on a product's label does fall within the NLEA express preemption provision. As stated above, § 343(q) governs nutrient content, and the FDCA specifically includes a requirement that the "label or labeling" of food products intended for human consumption state "the amount of . . . total protein contained in each serving size or other unit of measure[.]" 21 U.S.C. § 343(q)(1)(D). Additional protein labeling requirements can be found in the FDCA regulations, which state in relevant part that "[p]rotein content may be calculated on the basis of the factor of 6.25 times the nitrogen content of the food[.]" 21 C.F.R. § 101.9(c)(7).

However, defendant's argument that plaintiff's claims are governed by these provisions is unpersuasive because it mischaracterizes the SAC. Plaintiff is not "attempt[ing] to impose" a method of calculating protein "based on tests of the product that do not conform with FDA's approved test[.]" (Reply at 7). Nor is he asserting that "the amount of protein listed on Combat's label is inaccurate[,]" (id. at 8), or that "the protein content of the product is less than stated on the product label[.]" (Id.). Rather, plaintiff alleges that defendant's conduct is fraudulent or misleading because it "tells consumers that it does not stuff its protein content, [but] it actually does[.]" (See Opp. at 19); (see also SAC at ¶ 31 (recognizing that while the number of grams of protein listed on the Product is "in line with FDA guidelines[,]" the issue is that defendant falsely "claim[s] that [its] product[] do[es] not count non-protein, nitrogen sources towards [its] protein content"). Therefore, read in context, the allegations do not implicate the NLEA preemption provisions regarding nutrient content. See, e.g., Red v. Kraft Foods, Inc., 754 F.Supp.2d 1137, 1142 (C.D. Cal. 2010) (finding that state law claims regarding the use of the phrases "made with real vegetables" and "made with real ginger and molasses" on defendants' packages were not covered by the NLEA preemption provisions because they did not suggest that a specific nutrient was absent or present in certain amounts); In re 5-hour Energy Marketing and Sales Practices Litigation, 2014 WL 5311272, *13-14 (C.D. Cal. 2014) (claims based upon defendants' alleged "false and misleading" "attempts to attribute 5-hour ENERGY's effects to B-vitamins and amino acids" were not covered by the NLEA preemption provision).

The cases upon which MPC relies, (see Motion at 10), do not compel a different conclusion.

In Gubala v. CVS Pharmacy, Inc., 2015 WL 3777627 (N.D. Ill. 2015), and Mee v. I A Nutrition, Inc., 2015 WL 2251303 (N.D. Cal. 2015), plaintiffs alleged that the amount of protein in the defendants' protein powder was overstated because they included non-protein nitrogen-containing ingredients in their calculations.  In Gubala, the plaintiff asserted that he was "deceived by the use of the phrases 'Whey Protein Powder' and '26 grams of high-quality protein' on the product's front label into believing the 26 grams of protein were derived solely from whey protein." Gubala, 2015 WL 3777627, at *4.  The court found, however, that "[r]emedying the allegedly deceptive labeling would require CVS to specifically identify each source of protein in the Product. . . .  Requiring CVS to differentiate between whey protein and protein from amino acids when labeling the protein content of its product would not be identical to the labeling requirements imposed by federal law." Id.

Similarly, in Mee, plaintiff alleged that "calculating protein content using nitrogen as a 'tag,' i.e., the method allowed under [FDA regulations], does not result in a direct measure of the actual protein content and that, in order to state the true protein content, the manufacturer must exclude any non-protein nitrogen-containing substances[.]" Mee, 2015 WL 2251303, at *3 (internal quotation marks, citations, and alterations omitted).  The court found that the claim was preempted because "it [sought] to base liability on defendant's failure to employ a testing procedure not imposed by or contained in any federal regulation, and, indeed, is a challenge to the very method allowed by the FDA." Id.

Here, remedying the alleged violations would not "require [defendant] to specifically identify each source of protein in the [p]roduct[,]" Gubala, 2015 WL 3777627, at *4, nor would it require "a testing procedure not imposed by or contained in any federal regulation[.]" Mee, 2015 WL 2251303, at *3.  If it turns out that Combat Powder's protein content does include non-protein nitrogen sources, remedying the violation would merely mean that defendant could no longer make untrue statements such as "we don't include amino acids, creatine[,] and other non-protein, nitrogen sources in our protein content." (See SAC, Exhibit ("Exh.") A, "Brand Promise" at 3).  It would not require that defendant change its nutritional information label or method of measuring protein.  In short, plaintiff's claims regarding defendant's alleged misrepresentations, on its

13

1    packaging and in its advertising more generally, are not preempted.

2                         2.    **Under- and Over-Inclusive Ingredients List**.

3          Plaintiff also claims that "although Defendant claims the Product contains [certain] beneficial

4 free form amino acid ingredients[,] the Product contains none of them." (See SAC at ¶ 43). He

5 also alleges that "Defendant failed to list all of the ingredients on the Product's label." (Id. at ¶

6 44). Defendant argues that such claims are preempted because the testing upon which plaintiff

7 relies, (see id. at Exh. B, "BioSynthesis Analysis") "did not comply with FDA's testing requirements

8 in 21 C.F.R. § 101.9(g)(2)." (See Motion at 12).

9          The methodology set forth in 21 C.F.R. § 101.9(g)(2) requires that samples used for

10 analyzing compliance with the FDA regulations "shall consist of a composite of 12 subsamples

11 (consumer units), taken 1 from each of 12 different randomly chosen shipping cases, to be

12 representative of a lot." 21 C.F.R. § 101.9(g)(2). A similar methodology must also be used to

13 determine "compliance with 21 C.F.R. § 101.36, which regulation addresses which 'dietary

14 ingredients' must be contained in the ingredient list in the Supplement Facts section of a dietary

15 supplement[.]" Mee, 2015 WL 2251303, at *3 (quoting 21 C.F.R. § 101.36).[2]

16          As with plaintiff's claims regarding defendant's allegedly misleading statements concerning

17 the source of protein in Combat Powder, the court must first determine whether this claim,

18 regarding the inclusion or exclusion of amino acids in the ingredients list, is subject to either of

19 NLEA's express preemption provisions. Here, the challenged list of ingredients is a nutrient

20 content claim because it is a direct statement about the nutrients in the product. The FDA

21 provides that "nutrient" encompasses nutrients of all types, including "vitamins, minerals, herbs,

22 and other similar nutritional substances" – such as "amino acids" – that are not required to appear

23 in the Supplement Facts panel. See Food Labeling; Requirements for Nutrient Content Claims,

24 Health Claims, and Statements of Nutritional Support for Dietary Supplements, 62 FR 49859,

25

26              [2] The standard is slightly different, however, in that "the sample for analysis shall consist

27 of a composite of 12 subsamples (consumer packages) or 10 percent of the number of packages
in the same inspection lot, whichever is smaller, randomly selected to be representative of the lot."

28 21 C.F.R. § 101.36(f)(1).

49859-60 (1997) (stating that "other similar nutritional substances" includes "enzymes such as bromelain and quercetin, amino acids, [and] nutritional antioxidants") (internal quotation marks omitted); see also Salazar, 2014 WL 2593601, at *6 (recognizing tea antioxidant statements as nutrient content claims).  Accordingly, claims regarding the ingredient list in Combat Powder, in particular those regarding the inclusion or exclusion of certain amino acids, are subject to NLEA's preemption provision regarding nutrient content.

Next, the court examines whether the resolution of plaintiff's claims may impose requirements upon defendant that are different – or more burdensome – than those set forth by the FDA.  See, e.g., Chacanaca, 752 F.Supp.2d at 1119 ("plaintiffs' claims need not fail on preemption grounds if the requirements they seek to impose are. . . . identical to those imposed by the FDCA and the NLEA amendments").  "[E]ach district court to have considered the matter has found . . . [that if] an FDA regulation provides that the question of compliance must be determined using the method specified therein, a state law claim that seeks to establish a violation of such regulation by a different methodology is preempted."  Mee, 2015 WL 2251303, at *4; see also Salazar, 2014 WL 2593601, at *6 (granting motion to dismiss a claim regarding antioxidant levels where plaintiff failed to allege that the independent testing on which she relied had been conducted in accordance with FDA regulations); Vital v. One World Co., 2012 U.S. Dist. LEXIS 186203, *2 (C.D. Cal. 2012) (defendant entitled to summary judgment on plaintiffs' claims related to magnesium and sodium content of a product where plaintiffs failed to offer evidence showing that the report upon which they relied had been conducted in accordance with FDA regulations); Burke v. Weight Watchers Int'l, Inc., 983 F.Supp.2d 478, 480 & 483 (D.N.J. 2013) (granting motion to dismiss regarding calorie content discrepancies where plaintiff failed to allege that its independent laboratory tests were conducted in accordance with the proper methodology).

Here, plaintiff does not allege that the testing upon which he relies was conducted in accordance with the 12-sample method set forth in 21 C.F.R. § 101.9(g)(2) or § 101.36(f)(1). Plaintiff attached the BioSynthesis Analysis to his SAC, which appears to have been conducted on the basis of just one sample.  (See, e.g., BioSynthesis Analysis at 3-4 & 10) (redacted, but appearing to include test results for 3 different powders – one of which is Combat Powder – and

only appearing to include one sample of each). Because these test results were attached to the SAC, plaintiff "appear[s] to have pleaded facts demonstrating preemption." Mee, 2015 WL 2251303, at *4; see also Franklin, 745 F.2d at 1228-29 (a complaint may be dismissed if it discloses some fact or a complete defense that will necessarily defeat the claim).

Under the circumstances, the court finds that the claims regarding the Combat Powder ingredient list, as pleaded, are preempted. However, given plaintiff's assertion that the allegation is "not based on an unapproved FDA test, but on Defendant's own test FDA test [sic] results[,]" (Opp. at 20), the court will grant plaintiff leave to amend to clarify whether plaintiff's claim is based on testing that follows FDA regulations. See Mee, 2015 WL 2251303, *4 (dismissing with leave to amend so that plaintiff could "allege compliance with § 101.9(g)(2)").

III.     WHETHER PLAINTIFF PLEADS FRAUD WITH PARTICULARITY.

Defendant asserts that "plaintiff's Complaint is deficient in its failure to plead [fraud] with the particularity required by Rule 9 of the Federal Rules of Civil Procedure."[3] (Motion at 14). It argues that because "plaintiff's entire Complaint centers around the allegedly fraudulent nature of MusclePharm's conduct regarding the disclosure of the protein content on its product label . . . it must satisfy Rule 9(b)'s particularity requirement." (Id. at 15).

Rule 9(b) applies to all allegations of fraud, not merely claims of, or specific causes of action for, fraud. See Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (applying Rule 9(b) to UCL and CLRA claims); see also In re 5-hour Energy, 2014 WL 5311272, at *5 ("allegations that 'sound in fraud' must be pleaded with particularity"). A pleading satisfies Rule 9(b)'s particularity requirement when it is "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." Vess v. Ciba-Geigy Corp. U.S.A., 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). Accordingly, courts uniformly hold that the plaintiff must plead "the who, what, when, where, and how" of the fraud it alleges. Id. (internal quotation marks

---

[3]     All "Rule" references in the remainder of this Order are to the Federal Rules of Civil Procedure.

omitted).  Thus, claims sounding in fraud must allege "an account of the time, place and specific content of the false representations as well as the identities of the parties to the representations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted); see also In re 5-hour Energy, 2014 WL 5311272, at *5 ("if the plaintiff claims that a statement is false or misleading, the plaintiff must set forth what is false or misleading about a statement, and why it is false") (internal quotation marks omitted).

Here, plaintiff repeatedly alleges that MPC engaged in a fraudulent course of conduct. (See, e.g., SAC at ¶ 5 ("Defendant has intentionally taken advantage of the nature of this scientific method by stuffing [its] product with . . .non-protein, nitrogen-containing ingredients in order to artificially boost their stated protein content"); ¶ 12 ("Defendant's [sic] further deceive and mislead the public by providing misleading test results . . . to hide the fact that they really do count non-protein nitrogen-containing ingredients [in] their Product"); ¶ 15 ("Defendant is aware that Eurofins is producing test reports that are intended to mislead and deceive the public")).  In fact, plaintiff alleges that all of the conduct upon which all of its causes of action are based is fraudulent:

> In an effort to reduce costs and increase corporate profits, Defendant purposefully and willfully deceives its consumers by (1) advertising that the protein content on their labels do not count nitrogen content from "non-protein" sources, (2) producing test results that are intended to mislead the public into believing that Defendant does not include non-protein, nitrogen sources in its protein content, (3) claiming ingredients that the Product does not contain, and (4) failing to claim ingredients that the Product does contain.

(SAC at ¶ 19).  Accordingly, the entirety of plaintiff's SAC must satisfy the requirements of Rule 9(b).  See Kearns, 567 F.3d at 1125 ("A plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of that claim.  In that event . . . the pleading as a whole must satisfy the particularity requirement of Rule 9(b)").

Plaintiff relies upon Astiana v. Ben & Jerry's Homemade, Inc., 2011 WL 2111796 (N.D. Cal. 2011), in which the court found a complaint sufficient that alleged: "[t]he 'who' is [defendants]. The 'what' is the statement that ice cream containing alkalized cocoa is 'all natural.'  The 'when' is

17

1  alleged as 'since at least 2006,' and 'throughout the class period.' The 'where' is on the . . .

2  package labels. The 'how statements were misleading' is the allegation that defendants did not

3  disclose that the alkalizing agent . . . is a 'synthetic.'" <u>Astiana v. Ben & Jerry's</u>, 2011 WL 2111796,

4  at *6.  Other courts have reached similar conclusions in UCL, FAL, and CLRA claims sounding

5  in fraud.  <u>See</u>, <u>e.g.</u>, <u>Ang v. Bimbo Bakeries USA, Inc.</u>, 2013 WL 5407039, *3 (N.D. Cal. 2013)

6  ("[P]laintiffs have identified 'the who' as defendant and 'the when' as the timeframe for the class

7  allegations. Plaintiffs have also identified with specificity the precise representations alleged to be

8  illegal, fraudulent, and misleading, as well as the specific products on which that language is

9  found.") (emphasis omitted); <u>Chacanaca</u>, 752 F.Supp.2d at 1126 ("[P]laintiffs have identified the

10  particular statements they allege are misleading, the basis for that contention, where those

11  statements appear on the product packaging, and the relevant time period in which the statements

12  were used.  As such, they have satisfied the requisite 'who, what, when, where, and how' of the

13  misconduct charged.").

14      Here, while plaintiff pleads that he relied on MPC's labeling and advertising, he does not

15  provide the content of the labels, packaging, and advertisements upon which he allegedly relied.

16  (<u>See</u>, <u>e.g.</u>, SAC at ¶¶ 7 & 11 (describing "marketing channels including . . . the product label,

17  statements by official MusclePharm representatives, website material, published print ads, and

18  other sources" and "blog postings") & ¶ 21 (stating that "Plaintiff relied on all of the above forms

19  of deceptive advertising and false advertising in choosing to purchase the Product")).  Plaintiff

20  does include the specific content of the "Brand Promise" from MPC's "MP Sports Science Institute"

21  website (<u>see</u> SAC at Exh. A), and he alleges reliance on the "Brand Promise."  (<u>See</u> <u>id.</u> at ¶ 37)

22  ("This 'Brand Promise' and similar statements . . . were <u>relied upon by Plaintiff</u>, the Class Members

23  and the consumers") (emphasis added).  Plaintiff further alleges that the "Brand Promise"

24  "permeates Defendant's marketing strategy" (SAC at ¶ 7), implying that MPC's advertising,

25  labeling, and marketing contain the same or similar claims as the "Brand Promise," but the court

26  is left without any information about the statement(s) to which plaintiff was actually exposed, and

27  upon which he actually relied.  In the Court's Order of June 11, 2015, the court specifically asked

28  plaintiff to include this information in his SAC.  (<u>See</u> Court's Order of June 11, 2015, at 2).

In the cases in which courts have found that plaintiffs adequately pled the "who, what, where, when, and how" for purposes of Rule 9(b), the plaintiffs identified "with specificity the precise representations" upon which they allegedly relied.  See Ang, 2013 WL 5407039, at *3; see also Von Koenig v. Snapple Beverage Corp, 713 F.Supp.2d 1066, 1077-78 (E.D. Cal. 2010) (claims were adequately pled where plaintiffs submitted samples of the labels alleged to be misleading, but the court dismissed "claims based upon other advertisements and marketing or based upon other labels not submitted to the court"); cf. Brazil v. Dole Food Co., Inc., 935 F.Supp.2d 947, 964 (N.D. Cal. 2013) (finding plaintiff did not meet the requirement of Rule 9(b) when the complaint "d[id] not clearly indicate the content of the labels upon which Brazil allegedly relied when making his purchases or the advertisements and website statements that he saw and supposedly found misleading.  Although Brazil alleges that Defendants' misrepresentations are part of an extensive labeling, advertising, and marketing campaign, he does not allege that he personally saw and/or relied on any misleading advertisements or website statements in particular.") (internal quotation marks and citation omitted).  Here, plaintiff's claims are adequately pleaded to the extent that he seeks liability based on the "Brand Promise" from the "MP Sports Science Institute" website, (see SAC at Exh. A), but are dismissed to the extent he seeks liability based upon any other marketing, advertising, or packaging materials (the content of which he has not pleaded).  See Ries v. Hornell Brewing Co., Inc., 2011 WL 1299286, *4 (N.D. Cal. 2011) (denying a motion to dismiss as to "claims [that] arise out of the alleged deceptive labeling of the products for which exemplary labels are appended to the complaint" but dismissing claims based upon "other advertisements and marketing or . . . other labels not before the Court").

IV.    WHETHER PLAINTIFF LACKS STANDING TO ASSERT CLAIMS BASED ON MPC'S WEBSITE.

Defendant argues that "[t]o the extent the Court finds plaintiff's allegations premised on MusclePharm's 'Brand Promise' as reflected in the printout attached as Exhibit A of plaintiff's Complaint are separable and distinct from his allegations regarding Combat's labeling, plaintiff's lawsuit must still be dismissed because plaintiff lacks standing to pursue claims based on those allegations."  (Motion at 13).  Defendant asserts that in order to have standing to assert a claim

based on the UCL, FAL, or CLRA, "a person must have suffered injury in fact and have lost money or property as a result[,]" and "as a result" requires "actual reliance[.]"  (Id.) (internal quotation marks omitted).  It argues that because the "Brand Promise" is "from a site that launched in June 2015" and because plaintiff purchased Combat Powder in January 2014, "he could not have seen or read, much less relied on," the "Brand Promise."  (See id. at 14) (emphasis omitted).

The flaw in defendant's argument, however, is that at the motion to dismiss stage, "a judge must accept as true all of the factual allegations contained in the complaint."  Erickson, 551 U.S. at 93-94, 127 S.Ct. at 2200.  The court can only consider materials outside the pleadings if the court converts the motion to dismiss to a motion for summary judgment.  See, e.g., Jacobson v. AEG Capital Corp., 50 F.3d 1493, 1496 (9th Cir. 1995).[4]  As noted above, plaintiff alleged that he relied on the "Brand Promise."  (See SAC at ¶ 37).  The fact that MPC asserts that the "Brand Promise" is from a website that may have been created after plaintiff purchased Combat Powder is not for the court to consider at this juncture.[5]  See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974) overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 807, 102 S.Ct. 2727 (1982) ("The issue is not whether a plaintiff will ultimately prevail but whether [he] is entitled to offer evidence to support  the claims.").

The court notes, however, that throughout plaintiff's Opposition to MPC's Motion, it appears as though plaintiff is doing everything he can to avoid stating outright that he relied on the "Brand

---

[4]  If defendant wants to raise this argument again, it may do so upon a motion for summary judgment.  Otherwise, particularly since defendant has not requested that the court take judicial notice of the Market Watch press release, the court cannot consider it on a motion to dismiss.  (See, generally, Motion & Reply).  Defendant's general statement in its Reply that the court may take judicial notice of the website as a whole is insufficient.  (See Reply at 3).  Additionally, the fact that plaintiff did not print out the website screen shot until April 28, 2015, does not mean that he did not rely on it previously.

[5]  In his Opposition, plaintiff also asserts that "Defendant does not . . . claim[] that [it] never made similar statements before the website went public, nor do[es it] claim the brand promise was not in existence at any time before, [and] it does not claim that Defendant has never represented the same statement to the consumer."  (See Opp. at 20).  That may be true, but given the fact that all claims based upon statements contained in anything other than the "Brand Promise" attached as Exhibit A to the SAC have been dismissed for failure to plead in accordance with Rule 9(b), any prior statements by MPC are irrelevant.

1   Promise." He writes, "Defendant also in vain argues that Plaintiff failed to allege that he has relied
2   on Defendant's promise. Plaintiff alleges at least 8 times throughout the complaint that he did rely
3   on the statements made by Defendant and that it is reasonable for consumers to do so." (Opp.
4   at 21). Here, for the first time, plaintiff uses "promise" rather than "Brand Promise" and then, in
5   response to defendant's arguments regarding the factual impossibility of plaintiff's reliance on the
6   "Brand Promise," points out the number of times he pleaded that he relied on "statements made
7   by Defendant[.]" (See id.). Although this may be nothing more than imprecise writing, the court
8   reminds plaintiff of the importance of accurate, precise, and truthful pleading and briefing.

9   V.       WHETHER PLAINTIFF STATES A CLAIM FOR UNJUST ENRICHMENT.

10          Defendant argues that the court should dismiss plaintiff's unjust enrichment cause of action
11  because "there is no independent cause of action for unjust enrichment." (Motion at 15). "Despite
12  some inconsistency in the law, several recent decisions by the California Court of Appeals have
13  held that 'unjust enrichment is not a cause of action, just a restitution claim.'" Bruton, 961
14  F.Supp.2d at 1099 (quoting Hill v. Roll Int'l Corp., 195 Cal.App.4th 1295, 1307 (2011)); see also
15  Melchior v. New Line Productions, Inc., 106 Cal.App.4th 779, 793 (2003) ("[T]here is no cause of
16  action in California for unjust enrichment. The phrase 'Unjust Enrichment' does not describe a
17  theory of recovery, but an effect: the result of a failure to make restitution under circumstances
18  where it is equitable to do so.") (internal quotation marks omitted). Federal courts in California
19  have also recognized that there is no distinct cause of action for unjust enrichment under
20  California law. See, e.g., Bruton, 961 F.Supp.2d at 1099; Robinson v. HSBC Bank USA, 732
21  F.Supp.2d 976, 987 (N.D. Cal. 2010) (dismissing with prejudice plaintiffs' unjust enrichment claim
22  brought in connection with their UCL claim because unjust enrichment does not exist as a stand-
23  alone cause of action). In this case, plaintiff may pursue restitution as a remedy in connection with
24  his other causes of action, but because he does not properly state an independent cause of action,
25  it must be dismissed.

26

27

28

VI.    WHETHER LEAVE TO AMEND IS WARRANTED.

Rule 15 provides that the court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); see also Morongo Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990) (The policy favoring amendment must "be applied with extreme liberality."). However, "[i]t is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court." Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 795, 802 (1971). This decision is guided by an examination of several factors, including: (1) whether the amendment causes the opposing party undue prejudice; (2) whether the amendment is sought in bad faith; (3) whether the amendment causes undue delay; (4) whether the amendment constitutes an exercise in futility; and (5) whether the plaintiff has previously amended his or her complaint. See DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 & n.3 (9th Cir. 1987).

Having liberally construed and assumed the truth of the allegations in the SAC, the court is persuaded that plaintiff's claims based on advertising, marketing, and packaging other than MPC's "Brand Promise" (see SAC at Exh. A) cannot be saved through amendment. In its order of June 11, 2015, the court granted MPC's first Motion to Dismiss with leave to amend and specifically stated that it "expects that plaintiff will set forth all facts upon which he relies (i.e., describe the advertising and packaging materials it alleges are misleading) and articulate the alleged deficiencies in advertising, labeling, and/or packaging with sufficient clarity that the defendant and the court are able to understand his theory." (See Court's Order of June 11, 2015, at 2) (further stating that the court "expects that plaintiff will plead with particularity all claims that sound in fraud"). Perhaps most importantly, the court warned that this would be "plaintiff's final opportunity to amend the complaint." (Id.) (emphasis omitted). Because plaintiff has yet again failed to describe with sufficient detail the advertising upon which he allegedly relied, the court will not grant another opportunity to amend claims relating to unspecified marketing, advertising, and/or labeling. See Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1058 (9th Cir. 2011) ("[T]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.") (internal quotation marks omitted);

1   see also Mir v. Fosburg, 646 F.2d 342, 347 (9th Cir. 1980) (holding that a district court's discretion

2   over amendments is especially broad "where the court has already given a plaintiff one or more

3   opportunities to amend his complaint").

4          However, because the court did not previously address the merits of defendant's

5   preemption arguments, the court will grant plaintiff an opportunity to amend his allegations with

6   respect to the testing that forms the basis for his ingredients list claims.  (See Discussion § II,

7   supra).

8                                        **CONCLUSION**

9          Based on the foregoing, IT IS ORDERED THAT:

10         1. The hearing set for August 13, 2015, is hereby **vacated**.  Defendant's Motion to Dismiss

11   Plaintiff's Second Amended Complaint **(Document No. 38)** is **granted in part** and **denied in part**,

12   as follows:

13                A.  The FDA does not have primary jurisdiction over this matter;

14                B.  Plaintiff's claims with respect to the alleged misrepresentations in defendant's

15   advertising, marketing, and labeling are not preempted;

16                C.  Plaintiff's claims with respect to the allegedly inaccurate ingredients list are

17   preempted as pleaded, and are **dismissed with leave to amend**;

18                D.  The Motion is **denied** with respect to plaintiff's claims based upon the alleged

19   misrepresentations contained in defendant's "Brand Promise" on its "MP Sports Science

20   Institute" website;

21                E.  Plaintiff's claims based upon the alleged misrepresentations in advertisements,

22   marketing, and labeling other than that described in paragraph D above are **dismissed**

23   **without leave to amend**;

24                F.  Plaintiff's cause of action for unjust enrichment is **dismissed without leave to**

25   **amend.**

26         2.  If plaintiff still wishes to pursue this action, he is granted until **August 17, 2015**, to file

27   a Third Amended Complaint attempting to cure his claims related to the allegedly inaccurate

28   ingredients list and the allegedly misleading "Brand Promise" on the "MP Sports Science Institute"

website.  Other than setting forth additional factual allegations to support his claims related to these two claims, **plaintiff may not add any new claims or theories to the Third Amended Complaint**.  The court expects that plaintiff will set forth the testing method upon which plaintiff relies and articulate the alleged compliance with the method set forth in applicable FDA regulations.  If the testing method does not comply with the method set forth in applicable FDA regulations, the court expects that plaintiff will not pursue these claims.  Plaintiff shall eliminate all claims made on the basis of alleged misrepresentations in advertisements, marketing, and labeling other than that described in paragraph 1.D. above, and may only include those based upon the "Brand Promise" on the "MP Sports Science Institute" website. The Third Amended Complaint should plead plaintiff's reliance on the "Brand Promise" in a straightforward manner. **This will be plaintiff's final opportunity to amend the complaint.**

3.  The Third Amended Complaint must be labeled "Third Amended Complaint" and filed in compliance with Local Rule 3-2 and contain the case number assigned to the case, i.e., Case No. CV 14-8869 FMO (AGRx).  In addition, plaintiff is informed that the court cannot refer to a prior pleading in order to make his Third Amended Complaint complete.  Local Rule 15-2 requires that an amended pleading be complete in and of itself without reference to any prior pleading.  This is because, as a general rule, an amended pleading supersedes the original pleading.  See Loux v. Rhay, 375 F.2d 55, 57 (9th Cir. 1967), overruled in part, Lacey v. Maricopa County, 693 F.3d 896 (9th Cir. 2012) (en banc).

4.  Plaintiff is cautioned that failure to timely file a Third Amended Complaint may result in this action being dismissed without prejudice for failure to prosecute and/or failure to comply with a court order.  See Fed. R. Civ. P. 41(b); Link v. Wabash R.R. Co., 370 U.S. 626, 629-30, 82 S.Ct. 1386, 1388 (1962).

5.  Defendant shall file its Answer to the Third Amended Complaint or a motion pursuant to Fed. R. Civ. P. 12 no later than **August 24, 2015.** In the event that defendant wishes to file another motion to dismiss, it may do so by that date.  If it wants the court to take judicial notice of the date that its "MP Sports Science Institute" site launched, it must make that request properly. The court hereby waives the meet and confer requirement set forth in the Local Rules.

1    6.   In the event defendant files a motion to dismiss, plaintiff shall file its opposition to

2   defendant's motion to dismiss no later than **August 31, 2015**.  Defendant shall file a reply brief

3   no later than **September 8, 2015.**

4   Dated this 11th day of August, 2015.

5

6                                                     _____
                                                                  /s/
7                                                          Fernando M. Olguin
                                                       United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28